**In re Tonya P. STUMP, Debtor.**

**No. 01–56133.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

June 28, 2002.

J. Matthew Fisher, Ricketts & Onda Co. LPA, Columbus, OH, for debtor.

Lynn Rowe Larsen, Law Office of Timothy Farrell Sweeney, Cleveland, Ohio, for Gardner Denver, Inc.

Geoffrey J. Peters, Weltman Weinberg & Reis Co., LPA, Columbus, Ohio, for The Providian Bank.

Alexander G. Barkan, Columbus, OH, Assistant United States Trustee.

Michael T. Gunner, Hilliard, OH, Chapter 7 Trustee.

## MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

Gardner Denver, Inc. ("Gardner") and The Provident Bank ("Provident") have filed Motions to Dismiss. They assert that the chapter 7 bankruptcy filing of Tonya P. Stump ("Debtor") is in bad faith, and seek dismissal pursuant to section 707(a) of the United States Bankruptcy Code ("Code"). The dispute emanates from a long series of complex relationships, transactions, collection tactics, and subsequent efforts to shield assets. The facts cry out for resolution through a non bankruptcy workout or through reorganization proceedings, rather than through the instant chapter 7 filing. Based upon the evidence, statements of counsel, and a review of applicable case law and statutory provisions, the Court has determined that this case should be dismissed for two years. This dismissal is subject to the terms and conditions detailed below. The Court submits this Memorandum Opinion and Order as its findings of fact and conclusions of law.

The Debtor married Jon Kevin Stump ("Mr.Stump") in 1990, and they have three children, ages ten, eight and five. Mr. Stump initially worked as an employee of Compressor Energy, Inc. ("Compressor"), which was a distributor of compressors obtained primarily from Gardner. Between 1994 and 1995, Mr. Stump became the principal of Compressor, and on Janu-

ary 29, 1997, he executed a distributor agreement with Gardner. This arrangement with Gardner included a $200,000.00 line of credit. During this period the Debtor was working as a receptionist at a major law firm. She considered entering law school, but because of child care issues became interested in the daycare industry. In 1995 the Debtor formed her own daycare business known as Enchanted Care Learning Center, Inc. ("Enchanted").

The acquisition of a very comfortable lifestyle complemented these significant professional accomplishments. This lifestyle included a $500,000.00 home in the prestigious Wedgewood development, and a Wedgewood Country Club membership. In addition, the Debtor and Mr. Stump gave their children private school instruction, ballet and tap lessons, and custodial accounts for their education. The Stumps drove several luxury motor vehicles, including two Mercedes automobiles, a Porsche, a Chevrolet Impala, and a GMC sports utility vehicle. Between December 1999 and February 2002, the Debtor and her family went on approximately ten vacations that entailed significant expenditures. Also during this period, they were subject to judgments and collection efforts of Gardner and Provident.

The record shows that the Debtor and her husband, Mr. Stump, were on an upward spiral. His business grew significantly from 1997 to 1998, with $2.5 million to $3 million in gross revenues. Similarly, the Debtor's business grew from one location in a strip mall to three locations, including a state-of-the-art facility opened in Lewis Center, Ohio, shortly before the instant bankruptcy filing. With this growth, Mr. Stump's business developed cash flow problems that caused a significant deterioration in his relationship with Gardner. This declination was critical because Gardner supplied products encompassing approximately 40–50 percent of the sales of Compressor.

It was also during this period that the Debtor and Mr. Stump began their banking relationship with Provident. Previously, they had both been at Bank One, but Mr. Stump moved his business to Provident in June 1997, through his contact with Todd Price ("Mr.Price"), a former fraternity brother. Shortly afterwards, the Debtor established a banking relationship with Provident. The motivations for the change included the belief that Provident, being new to the Columbus market, was a more aggressive lender, and that they would view their business enterprises separately for lending purposes. Apparently, this linking of the entities had been a source of difficulty in prior banking relationships.

When they accomplished the moves to Provident, guaranties were involved. The Debtor was a guarantor on the Compressor loans as the wife of Mr. Stump. Mr. Stump served as a guarantor on the loans to Enchanted. The Debtor's grandparents, Johnny and Elizabeth Wells ("the Wellses") also guarantied the loans to Enchanted. They have played a pivotal role in the finances of the Debtor and Mr. Stump. This connection appears to have been a major obstacle to past settlement efforts of the parties.

Financial difficulties surfaced in May 1998, when the balance on Compressor's line of credit with Gardner grew to approximately $500,000.00—more than double the limit. This prompted a long series of discussions that ultimately involved some payment on the balance, the granting of security interests, and the execution of personal guaranties. Before this time, it appears that Provident may have been in a superior security position. In June or July 1998, the Debtor and Mr. Stump took out a home equity loan on their 10334

Wellington property. As a result, they paid $100,000.00 to Gardner. Simultaneously, they took out another $100,000.00 to purchase a lot in Wedgewood (5150 Canterbury). The Debtor and Mr. Stump planned to build another home.

As part of the payment to Gardner and to ensure continued shipments, in July 1998 the Debtor signed a guaranty for the Compressor debt to Gardner. At this point, she became obligated on Compressor's debt not only to Provident but also its debt to Gardner. In August 1998, which was shortly after the payments to Gardner and the execution of the note and guaranty, disputes over the terms of shipping between Compressor and Gardner emerged. There appears to have been an effort to require payment toward outstanding balances before shipping new products. The shipping term dispute appears to have been key to the viability of Compressor given the major amount of business devoted to Gardner's products. In September 1998, Compressor also paid an additional sum of $50,000.00 to Gardner from its operating revenues.

In February 1999, the situation of Compressor deteriorated further. On February 4, 1999, Gardner started sending monthly notices of default to Compressor. Also, during this month, Compressor missed a payment on the obligations to Provident. This default prompted Mr. Price to summon Mr. Stump to a meeting. According to the testimony of Mr. Stump, Mr. Price urged a prompt cure of the default so that they would not transfer the loans to Cincinnati. During this meeting, Mr. Price expressed that Provident deemed all of the loans of Compressor and Enchanted to be cross collateralized. This meant that not only were the Debtor and Mr. Stump responsible for each other's obligations, but also that Provident deemed the Wellses to be obligated on the

loans to Compressor. According to Mr. Stump, when he conveyed this position to the Debtor, it surprised and greatly distressed her. This news prompted the Debtor to refinance her loans and obtain additional financing with Delaware County Bank on April 30, 1999. According to the testimony of the Stumps, however, Provident still declined to release the Wellses. This linkage between the Stumps and the Wellses appears to be an impediment to settlement efforts, and is at the heart of the dispute between the Stumps and Provident.

On March 30, 1999, Gardner commenced its lawsuit on the note and guaranty, and they canceled the distributorship agreement on May 27, 1999. During this period, however, Compressor continued to accept orders for Gardner products, and did not return customers' deposits. Also during the spring of 1999, the Stumps concluded a series of real estate transfers. First, on April 13, 1999, a 9790 Oxford Circle lot in the Wedgewood development was deeded from the Debtor to the Wellses. The Debtor asserts that this lot was originally deeded in her name in order to supervise the construction of the Wellses home. The Wellses were residing in Texas at the time.

Second, on May 10, 1999, the Stumps deeded the 5150 Canterbury lot to the Wellses. According to the Debtor, this was done to repay the Wellses for a $40,000.00 loan to Enchanted. The Debtor also testified that it was in repayment for another $80,000.00 that the Wellses paid to her and Mr. Stump for the purchase of the 10334 Wellington lot. Third, on May 10, 1999, Mr. Stump deeded 10334 Wellington into the sole name of the Debtor. At a minimum, these facts suggest that the Stumps were trying to shield assets from their creditors.

Shortly after these transfers, the collection efforts of Provident commenced. On May 17, 1999, Provident sent collection letters to customers of Compressor, and on May 18, 1999, Provident's lawsuit and confession of judgment was filed and granted. Subsequently, on July 26, 1999, Mr. Stump corresponded with Provident to restructure his loans. At this time, Mr. Stump also gave Provident liens on six vehicles owned by Compressor. Apparently they could not agree, because shortly thereafter, Provident repossessed and sold the vehicles. In December 1999, Provident garnished the Compressor accounts and ultimately tagged its furniture. It was during this period that the Debtor and her family took the first of approximately ten vacations in the midst of significant collection activity. They went to Walt Disney World from December 5, 1999, to December 13, 1999, and spent at least $1,100.00.

On January 10, 2000, the Debtor and Mr. Stump submitted a settlement proposal to Gardner. Gardner responded on January 17, 2000. As with Provident, the settlement efforts apparently failed, and on February 18, 2000, Gardner was granted a default judgment. On February 22, 2000, Mr. Stump formed a new entity, CNRG, Inc., that performs services similar to Compressor. The events of February 2000 culminated when Provident sued the Wellses to void the transfer of the 5150 Canterbury lot on February 29, 2000. The Debtor, through Enchanted, paid for separate counsel to represent the Wellses. As part of a settlement the Wellses deeded the 5150 Canterbury lot back to the Debtor. In turn, the Debtor deeded the lot to Provident. This lot, however, was subject to the lien of another lender, Union Savings Bank. The Debtor claims she had no knowledge of the lien, although she has reaffirmed this obligation.

During April 2000, the Debtor transferred to the Wellses a three-carat, $24,000.00 diamond from her engagement ring. According to the Debtor this was in exchange for $10,000.00. It was also during April 2000 that Mr. Stump purchased a 2000 Chevrolet Impala at the rate of $448.00 per month. The record shows that Mr. Stump also has a 2000 GMC sports utility lease for $675.00 per month, and three or four years ago he also leased a Porsche. In June 2000, the Debtor and Mr. Stump took their second vacation with their family. This time they went to Key West, Florida.

On July 3, 2000, the Debtor and Mr. Stump submitted another settlement proposal to Provident. Apparently, this effort proved unsuccessful, and on July 12, 2000, a foreclosure judgment on the Compressor building was entered. At some point before the foreclosure, Mr. Stump had received an expression of an interest to purchase the building for $700,000.00. It is not clear what was done with this information, and it does not appear that the interested party attended the foreclosure sale. Also in July 2000 the Debtor and Mr. Stump took their third vacation. They went to Cancun, Mexico, and stayed at the Ritz–Carlton. A month later, on September 9, 2000, the Debtor executed a lease for Enchanted's Lewis Center location. On September 14, 2000, a draft bankruptcy petition for Mr. Stump was faxed to Gardner.

The month of November 2000 proved eventful. First, the Stumps fired their counsel, and they failed to appear for a judgment debtor examination noticed by Gardner. It was also during the midst of all this activity that the Debtor inexplicably decided to acquire through Enchanted, a 2000 Mercedes 430 V valued at $60,000.00. The monthly lease payment is

$1,376.69. The Debtor traded her Mercedes wagon to accomplish this transaction. Yet another trip to Disney World was taken at the end of the year 2000. It was the fourth vacation for the Debtor and her family. This trip commenced on December 14, 2000.

A month later, they took a fifth vacation. This time the Debtor and her family traveled to Steamboat Springs, Colorado in the early part of January 2001. This trip included $1,625.00 for airfare, $350.00 for picture Christmas cards, $1,200.00 for ski clothing, and ski instructions. The Stumps stayed in condo lodging. On January 24, 2001, Gardner sued Enchanted for filing a false answer in its garnishment proceeding. The commencement of this lawsuit was succeeded by the sixth vacation, when the Stumps went to Deer Valley, Utah, on March 1, 2001. This trip included $1,400.00 for ski instructions and approximately $1,000.00 for ski equipment. Again, they stayed in condo lodging.

During May 1, 2001, and approximately 24 days before the instant filing, the Debtor borrowed $250,000.00 from the Wellses. These funds came from the equity in the Wellses' home. A secured commercial promissory note was executed on May 1, 2001, along with a guaranty of debt by Enchanted, and the Debtor's pledge of her stock in Enchanted. Ten days later, on May 11, 2001, a UCC–1 filing by Enchanted in favor of the Wellses was recorded. The Wellses obtained a security interest in what appears to be all of Enchanted's assets. On May 23, 2001, two days prior to the bankruptcy filing, Enchanted received an additional $81,000.00 from the Wellses to purchase equipment for the Lewis Center location. May 2001 ended with the instant chapter 7 bankruptcy filing commenced on May 25, 2001.

The bankruptcy filing, however, did not deter the vacation plans of the Debtor and her family. On June 6, 2001, a day before the bankruptcy schedules were filed, the Stumps took a trip to the Bahamas. This seventh vacation included $10,000.00 in expenditures charged through Enchanted. The Debtor testified that the Wellses and Mr. Stump's parents at some point reimbursed her for these charges. On August 25, 2001, the Debtor spent $2,236.00 for ballet and tap lessons for the children. On this day the Stumps also took their eighth vacation. They traveled to Port Clinton, Ohio, at a cost of $700.00.

On August 31, 2001, Gardner filed its Motion to Dismiss, and approximately ten days later, on September 10, 2001, the Debtor booked a trip for her and her family to Munich, Germany, for Christmas. A $2,000.00 deposit was billed to Enchanted. The Debtor canceled this trip one day later, on September 11, 2001. On October 3, 2001, Provident filed an adversary proceeding against the Debtor, objecting to her discharge, and on October 4, 2001, Provident filed its own Motion to Dismiss. The trial on the Motions was conducted on January 17, 2002, January 18, 2002, January 30, 2002, and February 15, 2002. In the midst of this heavy trial schedule, the Debtor and her family took a ninth vacation on January 19, 2002, to Beaver Creek, Colorado, to ski. Approximately thirteen days after the completion of the trial, the Debtor and her family took a February 28, 2002, trip to Deer Valley, Utah, to ski. This was their tenth vacation.

■ Section 707(a) of the Code governs this litigation and provides: "The court may dismiss a case under this chapter only after notice and a hearing and only for cause including—..." Over the years courts have used this "for cause" provision to dismiss chapter 7 filings that are

deemed to be in bad faith.[1]

■ The judicial motivation stems from a recognition that while there is no explicit good faith requirement for chapter 7 debtors, unlike those filing under chapter 13, it is inherent in the purposes of bankruptcy relief. As noted by the Sixth Circuit:

> The Bankruptcy Code is intended to serve those persons who, despite their best efforts, find themselves hopelessly adrift in a sea of debt. *Bankruptcy protection was not intended to assist those who, despite their own misconduct, are attempting to preserve a comfortable standard of living at the expense of their creditors.* Good faith and candor are necessary prerequisites to obtaining a fresh start. *The bankruptcy laws are grounded on the fresh start concept. There is no right, however, to a head start. In re Zick,* at 1129–1130

*quoting In re Jones,* 114 B.R. 917, 926 (Bankr.N.D.Ohio 1990). (emphasis supplied)

■ Courts have recognized that a decision to dismiss must be based upon the facts and circumstances of each case, and that we should dismiss only the most egregious cases. Factors cited by the *Zick* Court include: (a) concealed or misrepresented assets and/or sources of income; (b) excessive and continued expenditures; (c) lavish lifestyle; and (d) an intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence. *In re Zick,* at 1129. Over time these four elements have been expanded in this Circuit to include fourteen factors.[2]

By invoking sections 105(a) and 349(a) of the Code, courts have employed many remedies to address bad faith bankruptcy cases. Future filings have been enjoined, sanctions have been imposed, the dis-

---

1. *In re Zick,* 931 F.2d 1124 (6th Cir.1991) (Chapter 7 dismissed where debtor filed immediately after entry of a $600,000.00 mediation award); *In re Merritt,* 211 F.3d 1269 (6th Cir.2000) (Chapter 7 dismissed where the debtor sought to avoid payment to his two largest creditors involving a single transaction. Also, the debtor had a condominium in Vail Colorado); *In re Spagnolia,* 199 B.R. 362, 365–367 (Bankr.W.D.Ky.1995) (Chapter 7 dismissed because filing was commenced by physician to avoid payment on a judgment related to an attack by his dogs); *In re Blumenberg,* 263 B.R. 704, 715–717 (Bankr. E.D.N.Y.2001) (Case converted from chapter 11 to chapter 7 dismissed on the basis that the filing was a collateral attack upon a breach of contract judgment); *see generally* Katie T. Kimlinger and William P. Wassweiler, *The Good Faith Fable of 11 U.S.C. Sec. 707(a): How Bankruptcy Courts Have Invented A Good Faith Filing Requirement for Chapter 7 Debtors,* 13 Bankr.Dev.J. 61 (1996) (Authors are critical of such dismissals and argue that section 707(a) should be limited to the enumerated grounds for dismissal. They assert that creditors should use alternative statutory provisions such as sections 522, 523, 544, 547, 548 and 727.)

2. 1. The debtor has reduced the creditor body to a single creditor immediately before filing;

   2. *The debtor has failed to make appropriate lifestyle adjustments;*

   3. *There is an intent to avoid payment of a large single debt that has been reduced to judgment;*

   4. *The debtor did not try to repay;*

   5. The use of chapter 7 is unfair;

   6. The debtor has sufficient resources to pay debts;

   7. The debtor is paying obligations to insiders;

   8. The schedules inflate expenses;

   9. *The debtor transferred assets;*

   10. *The debtor is abusing the protections of the Code;*

   11. *The debtor showed a pattern to evade a single major creditor;*

   12. The debtor failed to make full disclosure;

   13. The debts are modest in relation to assets and income;

   14. There are multiple bankruptcy filings or other procedural "gymnastics."

*In re Spagnolia,* at 365 (emphasis supplied).

charge of debts has been barred, and bars from any future filings for finite and indefinite periods have been ordered.[3]

■ Based upon a review of the evidence, including an assessment of the relative credibility of the witnesses, the Court has concluded that the facts warrant bad faith dismissal. First, this case is about nothing more than a dispute between the Debtor and two creditors—Gardner and Provident. Provident and Gardner are by far the largest scheduled creditors. Gardner has a scheduled secured claim of $510,353.33, and Provident has a scheduled secured claim of $497,427.00. Combined, they have claims of $1,007,780.33. This represents more than 60 percent of the scheduled secured claims. In addition, Gardner and Provident have been the most aggressive creditors by obtaining judgments, executing garnishments to collect, and bringing the instant litigation.

Regarding general unsecured debt, a total of $82,488.11 has been scheduled. The Debtor testified that a significant amount of the scheduled charge card debt emanates from the business operations of Compressor. Attorneys that have represented the Stumps and the Wellses in their litigation with Gardner and Provident hold the other large general unsecured claims. The Wellses also have a scheduled unsecured claim for sums lent to the Debtor. They, however, have been closely involved and even subject to litigation in this dispute between the Stumps, Gardner and Provident.

Second, while there are legal disputes with Gardner and Provident, the Debtor has not taken sufficient steps to address their claims. Without passing judgment on the actions of Gardner and Provident, it appears that the Debtor and Mr. Stump have raised serious concerns regarding the positions taken. The issues include Gardner's shipping terms, Provident's determination that all of the loans where cross collateralized, and the significant collection efforts taken by both Gardner and Provident. While there have been many settlement proposals offered on both sides, the fact remains that the Debtor and Mr. Stump have paid only limited amounts on obligations greater than one million dollars. Gardner has only received

**3.** *In re Cooper,* 153 B.R. 898, 899–900 (D.Colo.1993), *aff'd,* 13 F.3d 404 (10th Cir. 1993) (Involved permanent denial of a discharge of debt totaling $65,000); *In re Jones,* 41 B.R. 263, 267 (Bankr.C.D.Ca.1984) (Debtor and counsel sanctioned for multiple bankruptcy filings); *In re Leavitt,* 209 B.R. 935, 941–943 (9th Cir. BAP 1997) (Ninth Circuit BAP concluded that upon finding of cause for dismissal with prejudice future filings could be barred indefinitely), *aff'd* 171 F.3d 1219, 1223 (9th Cir.1999); *In re Geller,* 96 B.R. 564, 568–69 (Bankr.E.D.Pa.1989) (Counsel for debtor sanctioned under FRBP 9011, six month filing moratorium imposed, and court required prior permission before any new case could be filed); *In re Millers,* 90 B.R. 567, 568 (Bankr.S.D.Fla.1988) (Permanent filing bar imposed where multiple filings were commenced with different names and social security numbers); *In re Casse,* 198 F.3d 327, 339 (2nd Cir.1999) (The Second Circuit held that bankruptcy courts may impose indefinite barto re filing in order to allow creditor to complete collection efforts); *contra In re Frieouf,* 938 F.2d 1099, 1102–1105 (10th Cir. 1991); *cert. denied* 502 U.S. 1091, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992) (The Tenth Circuit concluded that the new filings can only be barred for 180 days pursuant to section 109(g) of the Code); *In re Weaver,* 222 B.R. 521, 522–524 (Bankr.E.D.Va.1998) (Case dismissed with prejudice and debtor barred from re filing for twelve months. When debtor filed despite this moratorium, court barred discharge of debt and applicability of the automatic stay); *In re Stathatos,* 163 B.R. 83, 87–88 (N.D.Tex.1993) (Serial filing dismissed with prejudice to re filing for two years, and affirmed on appeal by the district court); *In re Lerch,* 94 B.R. 998, 1001–1002 (N.D.Ill. 1989) (Serial chapter 12 dismissed with prejudice to a re filing for two years).

$150,000.00 following the execution of the note and guaranty, and shortly before this filing received $1,400.00 from a garnishment. To receive payment on the garnishment, Gardner was forced to commence litigation against Enchanted for filing a false answer in the garnishment proceeding. Similarly, Provident has only received modest sums from the foreclosure and sale of Compressor's equipment, and perhaps the 5150 Canterbury lot. As it turns out, the lien of Union Savings Bank encumbers that lot, and is also the subject of litigation with Gardner.

Third, while there may not be income or assets to satisfy the claims of Gardner and Provident fully and immediately, there are significant and available resources to make some payment over time. The Debtor and Mr. Stump have two businesses as continued sources of income, Enchanted and CNRG, Inc. Their tax records show combined income of $126,625.00 for 2000, and $198,880.00 for 1999. For 2001 the Debtor alone had income of at least approximately $100,000.00, that included salary and draws. This figure may be further increased when personal expenditures charged through Enchanted are considered. While no evidence was presented as to the value of CNRG, Inc., there is expert testimony assigning a value of greater of $388,113.00 to Enchanted.

Regarding the monthly budget of the Debtor and her family, significant savings are possible. For example, currently they have a mortgage payment of $5,000.00 per month, and a Mercedes lease payment in the amount of $1,376.69. They also pay country club membership dues of $250.00 per quarter. They spend approximately $200.00 per month for cleaning and lawn service. In addition, the Stumps make contributions to educational accounts for their children in excess of $1,000.00 per month, and maintain retirement accounts

for themselves. Rather than attempting to come forward with payment, the Debtor and her family have continued to enjoy a lifestyle that is not commensurate with the indebtedness. The Debtor and her family live in a $500,000.00 home in the prestigious Wedgewood development. One of their children attends The Marburn Academy at the rate of $14,000.00 per year, and they have paid more than $2,000.00 for dance lessons. The Debtor and her family have at their disposal three vehicles, a 2000 Mercedes, a 2000 Chevrolet Impala, and a 2000 GMC sports utility vehicle. Approximately ten vacations have been identified to the Court, and some of them were even taken while the Debtor was engaged in the instant litigation.

The Debtor and Mr. Stump have worked hard and been successful, but their current lifestyle is not commensurate with the indebtedness they have incurred. It is grossly excessive. Surely, they could make significant adjustments without harming their valid interests in providing a home, education and comfortable living for themselves and their children.

Fourth, the Debtor and her family have engaged in shielding assets from Gardner and Provident. The record suggests that the Debtor and Mr. Stump have taken many actions that were in response to or in order to avoid creditor collection efforts. Without making a fraudulent conveyance or preference determination, questionable transactions include the transfer of the lots and home in Wedgewood, the establishment of the educational accounts and maintenance of their retirement accounts, the transfer of the diamond to the Wellses, the personal expenses paid through Enchanted, and most recently the pledge of Enchanted stock and granting of a security interest to the Wellses on the eve of this bankruptcy filing. These efforts appear at a minimum to be motivated to frustrate or

significantly delay Gardner and Provident from collecting, and to so encumber assets as to render the Stumps judgment proof. It is grossly unfair for the Debtor and Mr. Stump to walk away from their obligations with two businesses and a lifestyle that the average debtor would find unimaginable.

For these reasons, the Court has determined that this bankruptcy filing should be dismissed for two years. Given the level of assets and complexities, this time will be necessary to allow Provident and Gardner to obtain any possible satisfaction on their judgments. The Court has further determined that this dismissal can be stayed for a sixty-day period. A stay will be imposed only if the Debtor, Gardner and Provident file within twenty days from the entry of this Order, a joint statement of willingness to participate in a settlement conference with another judge in this District. The goal would be to determine if the parties can agree to an out-of-court workout or a restructuring of the obligations through chapter 11 proceedings. In the absence of a timely election, a final judgment on this Memorandum Opinion and Order will be entered. In addition, if a settlement is not reached in sixty days or at the expiration of a further period extended by this Court, a final judgment on this Memorandum Opinion and Order will be entered.

**IT IS SO ORDERED.**