### In re Garth M. EDDY, Debtor.

No. 02–32040.

United States Bankruptcy Court,
E.D. Tennessee.

Dec. 10, 2002.

Shannon van Tol, Rodney A. Fields, Lewis, King, Krieg & Waldrop, P.C., Knoxville, TN, for Steven M. Hull.

Robert M. Bailey, Bailey, Roberts & Bailey, P.L.L.C., Knoxville, TN, for Debtor.

Michael H. Fitzpatrick, Jenkins & Jenkins Attys., PLLC, Knoxville, TN, Chapter 7 Trustee.

Ellen B. Vergos, United States Trustee, Patricia C. Foster, Knoxville, TN, for United States Trustee.

### MEMORANDUM ON MOTION TO DISMISS

RICHARD S. STAIR, Jr., Bankruptcy Judge.

This matter is before the court on the Motion to Dismiss filed on August 21, 2002, by Steven M. Hull (Mr. Hull) on behalf of his minor children, Andrew and Mallory Hull (the Hull Children), asking the court to dismiss the Debtor's Chapter 7 bankruptcy case for failure to file the petition in good faith.

The trial of this contested matter was held on December 3, 2002. The record before the court consists of eighteen exhibits introduced into evidence and the testimony of three witnesses, James R. Scroggins, Mr. Hull, and the Debtor.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A) and (O) (West 1993).

### I

The Hull Children are creditors of the Debtor by virtue of an August 28, 2000 Judgment of the Jefferson County Chancery Court (the Judgment) ordering the Debtor to pay life insurance proceeds in the amount of $100,665.00 from his former wife's estate to Mr. Hull for the benefit of the Hull Children, together with pre-judgment interest. The Judgment was affirmed by the Tennessee Court of Appeals on May 8, 2001. *See Hull v. Hull*, No. E2000–02696–COA–R3–CV, 2001 Tenn. App. LEXIS 334, 2001 WL 483422 (Tenn. Ct.App. May 8, 2001).[1]

The May 8, 2001 opinion of the Tennessee Court of Appeals sets forth the following facts forming the basis of the state court action, which were confirmed by testimony before this court and are adopted herein:

Plaintiff [Mr. Hull] and deceased, Susan Hull, were divorced in June of 1996. The Divorce Decree ordered joint custody of their two children, and neither spouse was required to pay the other child support. The decree incorporated a marital dissolution agreement which stated, in pertinent part:

1. There was no appeal to the Tennessee Supreme Court.

**Life Insurance**—The husband shall maintain a life insurance policy for each child until each child is twenty-four years of age. He shall provide to the wife a statement documenting his insurance coverage in force, and the wife shall maintain life insurance for each child in an amount equal to that amount maintained by the husband. She shall likewise provide documentation of the coverage.

Approximately five months after the parties' divorce, deceased married the appellant [the Debtor], and subsequently obtained employment which provided her with life insurances [sic] and employee benefits, i.e., a life insurance policy in the amount of $50,000.00 and a second policy provided death benefits of $50,000.00. The appellant [Debtor] was designated as beneficiary on each of those policies. At the time of the divorce, the deceased had two policies of life insurance through State Farm, which were not addressed in the Marriage Dissolution Agreement. The coverage continued and deceased subsequently designated the two children as beneficiaries, and the benefits from those policies were $67,000.00.

On September 21, 1997, deceased was killed in a one-car accident, and plaintiff [Mr. Hull], after qualifying as administrator of his former wife's estate, brought this action against appellant [Debtor], beneficiary, of the policies.

*Hull,* 2001 Tenn.App. LEXIS 334, at *2–*3, 2001 WL 483422, at *1.

From May 2001 until February 2002, the Hull Children did not make any attempts to collect upon the Judgment, nor did the Debtor make any payments to the Hull Children to satisfy the Judgment. On February 7, 2002, James R. Scroggins, attorney for the Hull Children, issued a subpoena duces tecum, requesting that the Debtor appear on March 7, 2002, for the purpose of producing "any and all financial records relating to the receipt, deposit and disbursement of funds received as death benefits (life insurance proceeds), relating to the death of Susan Elizabeth Eddy." The Debtor was served with this subpoena on February 8, 2002; however, he did not appear, nor did he produce any records requested. Instead, he advised Mr. Scroggins that he was filing for bankruptcy. The Debtor filed the Voluntary Petition commencing his Chapter 7 case on April 16, 2002. Mr. Hull, on behalf of the Hull Children, filed the Motion to Dismiss on August 21, 2002.[2]

In his Statements and Schedules, the Debtor shows a total monthly income of $4,134.00 and total monthly expenses of $4,072.00. His Schedule A (Real Property) evidences that he does not own any real property, and his Schedule B (Personal Property) lists personal property consisting of a $280.00 checking account; furniture; books; pictures; clothing; $32,613.86 in a retirement account; $21,920.00 in an IRA account; a 1989 Oldsmobile; a 1996 Toyota Avalon; and a dog. The Debtor lists secured debts in the total amount of $5,355.70 and unsecured nonpriority debts in the total amount of $121,105.00. Accordingly, pursuant to the Summary of Schedules filed by the Debtor,

---

**2.** Additionally, on August 21, 2002, Mr. Hull, on behalf of the Hull Children, filed a Complaint initiating an adversary proceeding in which they seek a determination that the Judgment in the amount of $100,665.00 plus pre-judgment interest is nondischargeable pursuant to 11 U.S.C.A. § 523(a)(4) (West 1993), or, in the alternative, they request that the Debtor be denied a discharge pursuant to 11 U.S.C.A. § 727(a)(3), (4), or (5) (West 1993). The adversary proceeding, No. 02–3146, is pending, awaiting the outcome of the Motion to Dismiss.

his assets total $63,673.86 and his liabilities total $126,460.70.

## II

One of the primary goals of the Bankruptcy Code is to relieve the honest but unfortunate debtor of his indebtedness so that he may make a fresh start. *In re Krohn,* 886 F.2d 123, 125 (6th Cir.1989) (citing *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). The fresh start is accomplished in Chapter 7 cases by allowing a debtor to "discharge [all or a portion of his debts] in exchange for [the] liquidation of the debtor's assets for the benefit of his creditors." *Id.* However, "[t]here is no constitutional right to obtain a discharge of one's debts in bankruptcy." *United States v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 636, 34 L.Ed.2d 626 (1973).

In Chapter 7 bankruptcy cases, any party in interest may move to dismiss the case pursuant to 11 U.S.C.A. § 707 (West 1993), which provides, in material part:

(a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including—

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees or charges required . . . ; and

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, [the debtor's statements and schedules], but only on a motion by the United States trustee.

11 U.S.C.A. § 707(a). In the Sixth Circuit, the "for cause" language of § 707(a) includes a lack of good faith in filing the bankruptcy case. *Indus. Ins. Servs., Inc. v. Zick (In re Zick),* 931 F.2d 1124, 1126–

27 (6th Cir.1991); *see also Lane v. Fitzgerald (In re Fitzgerald),* Nos. 95–31578, 95–3098, 1996 Bankr.LEXIS 1690, at *12–*13 (Bankr.E.D. Tenn. April 4, 1996). Even though the Bankruptcy Code does not explicitly state that a Chapter 7 debtor must file in good faith, this concept is implicit in the basic purpose of bankruptcy relief to relieve the honest but unfortunate debtor of his indebtedness so that he may make a fresh start. *Zick,* 931 F.2d at 1129 (citations omitted). "Good faith and candor are necessary prerequisites to obtaining a fresh start." *Id.* (quoting *McLaughlin v. Jones (In re Jones),* 114 B.R. 917, 926 (Bankr.N.D.Ohio 1990)).

When deciding whether to dismiss a case for lack of good faith, the court must examine the facts of that particular case and focus on a totality of the circumstances. *In re Stump,* 280 B.R. 208, 214 (Bankr.S.D.Ohio 2002); *In re Spagnolia,* 199 B.R. 362, 365 (Bankr.W.D.Ky.1995). Dismissal should be reserved for only the most egregious cases. *Zick,* 931 F.2d at 1129; *Stump,* 280 B.R. at 214. Factors to be considered when making such a determination include the following:

1. The debtor reduced his creditors to a single creditor in the months prior to filing the petition.

2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle.

3. The debtor filed the case in response to a judgment[,] pending litigation, or collection action; there is an intent to avoid a large single debt.

4. The debtor made no effort to repay his debts.

5. The unfairness of the use of Chapter 7.

6. The debtor has sufficient resources to pay his debts.

7. The debtor is paying debts to insiders.

8. The schedules inflate expenses to disguise financial well-being.

9. The debtor transferred assets.

10. The debtor is over-utilizing the protection of the [Bankruptcy] Code to the unconscionable detriment of creditors.

11. The debtor employed a deliberate and persistent pattern of evading a single major creditor.

12. The debtor failed to make candid and full disclosure.

13. The debts are modest in relation to assets and income.

14. There are multiple bankruptcy filings or other procedural "gymnastics."

*Spagnolia*, 199 B.R. at 365. The existence of only one of these factors will not ordinarily support dismissal "for cause" under § 707(a), but the presence of a combination of factors will usually suffice. *Id.*

### III

■ In this case, the court finds several, if not a majority, of the *Spagnolia* factors present. For example, in his Schedule J (Current Expenditures of Individual Debtor), the Debtor lists, among others, the following monthly expenses: $650.00 for food; $75.00 for clothing; $60.00 for dry cleaning; $120.00 for medical and dental expenses; $610.00 for transportation (not including car payments); $550.00 for recreation, clubs, and entertainment; $70.00

for charitable contributions; $250.00 for massage therapy; and $143.00 for veterinary services.[3] The Debtor argued that these expenses were not lavish and attempted to explain their necessity.

First, regarding the expenses for food and recreation, the Debtor stated that he eats out a lot, sees several (two or three) movies per month, takes weekend trips to Atlanta, Georgia (five times per year), the Biltmore in Asheville, North Carolina (three times per year), Pigeon Forge, Tennessee, and Spartanburg, South Carolina, and that he does a lot of "wining and dining" with dates. Additionally, the Debtor testified that he subscribes to several newspapers and magazines, including *Kiplinger's* and *Consumer Reports*, that he maintains a health club membership at the YMCA for $25.00 per month, and that he plays handball, all of which contributed to the final total of $550.00 per month.

Second, regarding charitable contributions, the Debtor testified that he gives approximately $20.00 per month to his church, approximately $35.00 per year to the United Way, and that he buys Girl Scout cookies and makes miscellaneous donations to the firefighters and the March of Dimes each year. He also stated that he sends money to an ex-girlfriend in Alabama to take care of dogs that they had owned[4] and that he has given approximately $100.00 to a lady he works with who has lymphoma in order to assist with her doctor bills.[5]

---

3. The $4,072.00 total on Schedule J also includes $680.00 for rent; $150.00 for electricity and/or gas; $15.00 for water and sewer; $45.00 for cable; $24.00 for internet access; $20.00 for home maintenance; $113.00 for auto insurance; $59.00 for disability insurance; $285.00 for "ultrasound consultant, pension withdrawal" and $3.00 for a post office box.

4. At trial, the Debtor did not give an amount; however, according to his Statement of Fi-

nancial Affairs, he sent $300.00 during the year 2001–2002 to assist with expenses for three dogs.

5. Some of these claimed "expenses" are actually gifts and do not constitute actual "charitable contributions" as contemplated by the Bankruptcy Code. *See* 11 U.S.C.A. § 548(a)(2) (West 1993) ("A transfer of a charitable contribution to a qualified religious or charitable entity or organization ...."). Likewise, his gifts to the lady at work and the ex-girlfriend

Third, regarding the massage therapy and medical expenses, the Debtor testified that he has severe back problems. He testified that he has been wearing a brace for approximately four months, and that he sees a chiropractor two times per week and has massage therapy in order to help with his back problems.

Fourth, regarding the veterinarian expenses, the Debtor testified that he has a 15 year old dog that has, among other ailments, arthritis, requiring expensive medication.

Although some of these expenses are not lavish, the amounts expended along with the type of expenditures do evidence to this court that the Debtor has "failed to make lifestyle adjustments" and has "continued living an expansive lifestyle," especially in the light of a Chapter 7 bankruptcy filing. The court recognizes that the Debtor's medical expenses are probably legitimate, even when one considers that he has insurance coverage, and he admittedly receives a "courtesy discount" because he is in the medical profession. Additionally, the court cannot fault the Debtor for his veterinarian expenses, even though they do seem to be quite extensive. On the other hand, the court finds that it is unreasonable for the Debtor to continue "wining and dining" and taking weekend trips to the tune of $1,200.00 per month, to continue subscribing to costly magazines, and to maintain a health club membership while attempting to discharge his debts under Chapter 7.

Additionally, the court believes that the Debtor "has sufficient resources to pay his debts." In his Schedule I (Current Income of Individual Debtor), the Debtor listed monthly income in the amount of $4,134.00. This figure consists of gross monthly wages of $6,693.00 for his occupation as an ultrasound technologist with Takoma Hospital in Greeneville, Tennessee, plus $383.00 for regular income from operation of business or profession (ultrasound consultant),[6] less $1,702.00 for payroll taxes and social security, $112.00 for insurance, $875.00 for AHRP-pension, and $253.00 for CCU loan. At trial, the Debtor testified that his base salary is $28,000.00 per year, but that with bonuses and overtime, he earns approximately $80,000.00 per year.

Pursuant to his Schedule D (Creditors Holding Secured Debts) and Schedule F (Creditors Holding Unsecured Nonpriority Claims), the Debtor's debts consist of the following: $5,355.70 to Consumer Credit Union, secured by a 1996 Toyota Avalon; $400.00 to Discover; $740.00 to First USA Mastercard; $12,100.00 to GE Mastercard; $1,800.00 to his sister, Laura Eddy Rival;[7] $100,665.00 to the Hull Children; and $7,200.00 to USAA Mastercard. With the exception of the Judgment owed to the Hull Children, the Debtor's debts total $27,595.70. This is hardly an amount that an individual earning more than $80,000.00 annually cannot manage.

Furthermore, it appears to the court that many of the expenses listed in his Schedule J have been "inflated" to camou-

do not meet the definition of "charitable contribution" in the Internal Revenue Code. *See* 26 U.S.C.A. § 170(c) (West 2002).

**6.** The Debtor testified that, at the time he filed for bankruptcy, he earned this income working at an office in Cookeville on the weekends, but that he is no longer working there and no longer receives that income.

**7.** At trial, the Debtor testified that his sister made him a loan to pay attorneys' fees to Johnny Dunaway, one of the attorneys who had represented him in the state court lawsuit and appeal with the Hull Children.

flage his true financial condition. For instance, even though he listed charitable contributions in the amount of $70.00 on his schedules, at trial, he could account for only $20.00 per month in actual charitable expenses. Additionally, monthly expenses of $650.00 for food, $550.00 for recreation/entertainment, and $610.00 for transportation for one individual with no dependents is excessive.[8]

Based upon his income and his assets, the Debtor has more than sufficient resources to pay his debts. He is an ultrasound technician, with a gross annual income in excess of $80,000.00. He has no dependents, and he testified that he is single. His liabilities, excluding the Hull Children's Judgment, are $27,595.70, and even including the debt to the Hull Children, are modest in relation to his assets, which include an annual income of approximately $80,000.00, an IRA in the amount of $21,920.00, and a pension account in the amount of $32,613.86.[9] The Debtor has not adjusted his somewhat lavish lifestyle to which he feels he is entitled, and from his testimony, he has no intention of curtailing his many entertainments, despite the fact that he seeks to discharge $126,460.70. Finally, some of his expenses seem "inflated" in an attempt to disguise his financial well-being. Thus, the court finds that factors 2, 6, and 8 are present.[10]

Upon review of the Debtor's Statements and Schedules, it appears that other factors exist to support the Hull Children's Motion to Dismiss. In his Statement of Financial Affairs, the Debtor listed payments made to Discover Card in the total amount of $10,900.00 in March 2002, leaving a remaining balance owed to this unsecured, nonpriority creditor of $400.00. Additionally, the Debtor listed payments of $3,000.00 to his sister, an insider, in June 2001 and December 2001. A total of almost $14,000.00 was paid out by the Debtor to unsecured, nonpriority creditors within nine months of his bankruptcy filing. Accordingly, factors 1, 7, and 9 are implicated, at least in some fashion.

Additionally, the court finds that factors 3, 4, and 11 are present. Since 1997, Mr. Hull and the Hull Children have attempted to obtain information regarding life insurance from the Debtor to no avail. The Debtor testified that he knew that Mr. Hull desired information and documentation regarding the insurance proceeds received by the Debtor following the death of his wife; however, he also testified that Mr. Hull was not entitled to any information until a court ordered the Debtor to comply. According to the Debtor, it was only after the Judgment was entered in favor of the Hull Children that he was "obligated" to provide any information to Mr. Hull and/or the Hull Children. Despite this obligation, the Debtor, to this very day, has not provided the requested information to either Mr. Hull or the Hull Children.

Furthermore, the Debtor testified at a deposition in the state court proceedings in April 2000 that he had documentation showing the disposition of the insurance proceeds, and he agreed, at that time, to

---

8. Moreover, since the Debtor testified that he is no longer commuting to and from Cookeville, his transportation expenses should be decreased substantially.

9. According to his Schedule I, the Debtor deducts $875.00 per month for his pension. At trial, he testified that he has accumulated very little money towards retirement for someone his age. While that might be the case, the Debtor is contributing $10,500.00 per year to a retirement account while attempting to discharge $126,460.70 in debt.

10. Factor 13 is also implicated, in that the Debtor's debts, other than the Judgment owed to the Hull Children, are modest in relation to his assets and income.

retain this documentation "until the case was over with." However, at the trial before this court, the Debtor testified that once the Tennessee Court of Appeals affirmed the Judgment, and he decided not to appeal to the Tennessee Supreme Court, as far as he was concerned, the case was over with, and he was no longer required to keep these documents. When asked by counsel for the Hull Children when he destroyed the records, the Debtor stated that he did not remember destroying the documents; however, when asked by his own counsel why he did not retain the records, the Debtor replied that he did not keep them because "it was not necessary."[11] The Debtor further testified at trial that he has never made any payment to the Hull Children towards the Judgment, nor has he ever produced the documentation evidencing the disposition of the insurance proceeds he received that they have repeatedly requested and subpoenaed.

Evidence was also introduced demonstrating that every time something significant occurred in the state court proceeding within the past year, the Debtor sought bankruptcy counseling. For instance, on March 29, 2001, the Tennessee Court of Appeals heard oral argument regarding the appeal of the Judgment. According to his Statement of Financial Affairs, the Debtor sought bankruptcy counseling in April 2001. On May 8, 2001, the Tennessee Court of Appeals affirmed the Judgment, and in June 2001, the Debtor again sought bankruptcy counseling. No collec-

tion activity occurred until February 2002, when a subpoena duces tecum was issued and served upon the Debtor, requiring him to appear on March 7, 2002, and produce documentation. The Debtor did not appear, as he advised that he was filing for bankruptcy, and in fact, the Debtor did file this bankruptcy case on April 16, 2002.

In addition, factors 5 and 10 are present. It is obvious to the court that one of the primary reasons that the Debtor filed this Chapter 7 bankruptcy case was an attempt to use the Bankruptcy Code to avoid the payment of the Judgment to the Hull Children, resulting in detriment to them. The Judgment itself is based upon the Debtor's misappropriation of funds that the state court determined he was required to hold in trust for his deceased wife's minor children. The Debtor has used these insurance funds as leverage time and time again against these children. Evidence presented at trial indicates that the Debtor even attempted to use personal property of the Hull Children themselves against them, by holding hostage certain personal items belonging to the children, along with personal effects of their mother, and offering to release them only if they would "settle this matter." *See* Trial Ex. 2 (collective); Trial Ex. 6.

In the court's opinion, it would be unfair to allow the Debtor to continue to hold the Hull Children at bay, denying them the insurance proceeds to which they are entitled. The Debtor may not use the protections of the Bankruptcy Code to further injure these children.

---

11. The Debtor's conduct in disposing of these records is an issue in the adversary proceeding commenced by Mr. Hull objecting to the Debtor's discharge, *inter alia,* pursuant to 11 U.S.C.A. § 727(a)(3) (West 1993), which provides:

  (a) The court shall grant the debtor a discharge, unless—

   . . . .

(3) the debtor has concealed, destroyed, . . ., or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition . . . might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

Finally, and most importantly, factor 12 is present. The Debtor has failed to make candid and full disclosure, dating back to 1997 and continuing even through the trial of this matter before this court. As it relates to his bankruptcy case, the Debtor failed to disclose the existence of several financial accounts during his 2004 examination on July 26, 2002, and to date, he still has not provided documentation evidencing the disposition of the insurance proceeds.

First, the Hull Children introduced into evidence at trial various records exhibiting several bank and brokerage accounts that the Debtor had opened and closed since his wife's death in 1997.[12] In response to the subpoena for his attendance at a 2004 examination and production of documents relating to the insurance proceeds dating back to 1997, the Debtor provided documentation to the Hull Children consisting of the following: (1) SunTrust Bank account statements, for account No. 35517387, from May 2001 through April 2002; (2) Consumer Credit Union account statements from January 2001 through June 2002; (3) Ameritrade account statements, for account No. 160–584868, from March 2001 through June 2002; and (4) the Debtor's 1040 Tax Returns for 2000 and 2001. *See* Trial Exs. 7, 8.

However, even though he was subject to subpoena and his testimony was under oath, the Debtor did not disclose the existence of or produce any documentation regarding the following financial accounts at his 2004 examination in July 2002:(1) SunTrust bank account No. 35558253, opened in October 1997 and closed in August 1998; (2) First Trust & Savings Bank account, opened in August 1998 and closed in April 1999; (3) Fidelity Investments IRA accounts, opened beginning in February 1998 and all closed by December 31, 1998; (4) Ameritrade account # 1, for account No. 150611648, opened in February 1998 and closed in August 1998; (5) Ameritrade account # 2, for account No. 162–757777, opened in February 1999 and closed in December 1999; and (6) State Street Bank & Trust account, opened in late 1997 and closed in April 1998.[13] *See* Trial Exs. 10—15.

At trial, the Debtor testified that he did not disclose these accounts at his 2004 examination in July 2002 because he did not recall having them, despite numerous transactions shown by the Debtor in each account, involving large sums of money. The court does not accept the Debtor's testimony that he "failed to recall" all of these accounts, most notably, the State Street Bank & Trust account into which the insurance proceeds were deposited, at the Debtor's request, especially in light of the fact that the Debtor was able to recall the amounts he had paid in attorneys' fees to four different attorneys who had represented him in the state court action, dating back to 1997.[14]

The Debtor urges this court to use its discretion, based upon the following quotation from the Sixth Circuit in *Zick:*

**12.** These documents were obtained through discovery by the Hull Children from the relative financial institutions.

**13.** This account was opened for the Debtor's benefit by The Guardian Insurance Group, for the sole purpose of depositing the insurance proceeds at issue.

**14.** The Debtor's failure to make these disclosures at his meeting of creditors is also relied upon by Mr. Hull in support of his objection to the Debtor's discharge. Pursuant to 11 U.S.C.A. § 727(a)(4)(A).

> (a) The court shall grant the debtor a discharge, unless—
> . . . .
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
> (A) made a false oath or account[.]

Dismissal based on lack of good faith must be undertaken on an ad hoc basis. It should be confined carefully and is generally utilized on in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.

*Zick*, 931 F.2d at 1129 (citations omitted). The Debtor argues that the following factors in his favor preclude a finding of bad faith: (1) he has other creditors besides the Hull Children; (2) he was not facing immediate legal proceedings, such as a foreclosure; (3) almost a full year elapsed between the May 8, 2001 affirmation by the Tennessee Court of Appeals and the date of the Debtor's bankruptcy filing; (4) the Hull Children took no action to collect upon the Judgment between May 8, 2001, and February 7, 2002; (5) he does not have many assets; and (6) he has substantial credit card obligations. The Debtor also argues that this is not the type of egregious case envisioned by the Sixth Circuit as denoting dismissal for cause under § 707(a).

This court disagrees with the Debtor. Giving him the benefit of the doubt as to the above factors being in his favor, the court nevertheless finds the presence of thirteen out of the fourteen *Spagnolia* factors in some shape or fashion. These factors evidence the egregiousness of the Debtor's conduct with respect to the Hull Children. The Debtor has engaged in a pattern of conduct since shortly after his wife's death in 1997, designed to frustrate the efforts of Mr. Hull and the Hull Children to obtain information regarding the life insurance proceeds to which the Hull Children are entitled. In the ultimate effort to defeat the legitimate claims of the Hull Children to the insurance proceeds, he filed bankruptcy seeking a discharge under Chapter 7.

## IV

In summary, the court finds that the Debtor filed his Chapter 7 bankruptcy case in bad faith. The Debtor has not adjusted his lifestyle, but instead has inflated his expenses to disguise sufficient resources to pay his debts, which, with the exception of that to the Hull Children, are quite modest in comparison with his annual income of approximately $80,000.00. The Debtor has employed a "deliberate and persistent pattern of evasiveness" in his attempts to avoid payment of the Judgment owed to the Hull Children, resulting from his breach of fiduciary duty to them. Finally, the Debtor has failed to make candid and full disclosure, and in fact, admitted to concealing and/or destroying documentation that would evidence his financial condition. Taken together, these actions by the Debtor evidence to this court that it would be fundamentally unfair and unjust to allow him to use the protections of the Bankruptcy Code, and in particular, Chapter 7, to the continued detriment of his largest creditor, the Hull Children. The Debtor's bankruptcy case will accordingly be dismissed pursuant to 11 U.S.C.A. § 707(a) for cause.

An order consistent with this Memorandum will be entered.