**In re 3710 HENRICKS ROAD CORP., Debtor.**

**No. 05–43771.**

United States Bankruptcy Court, N.D. Ohio.

Oct. 5, 2005.

Timothy M. Reardon, Youngstown, OH, for Debtor.

**MEMORANDUM OPINION DENYING MOTION TO DISMISS**

KAY WOODS, Bankruptcy Judge.

On August 29, 2005, this Court held a hearing on the Corrected Motion of Creditor The Lamson & Sessions Co. for an Order, Pursuant to Section 707(a) of the Bankruptcy Code, Dismissing the Bankruptcy Case of the Debtor With Prejudice (the "Motion to Dismiss"). The Motion to Dismiss was opposed by the Chapter 7 Trustee (the "Trustee"), the Debtor 3710 Henricks Road Corp. f/k/a/ YSD Industries, Inc. ("YSD" or "Debtor") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union f/k/a the United Steelworkers of America, AFL–CIO–CLC (the "USW"), a creditor in this Chapter 7 case. All parties were present and represented by counsel at the hearing. In addition, an attorney for the

Mahoning County Treasurer, which has filed a proof of claim for priority taxes in this case, was allowed to address the Court.

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334. This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157. The following constitutes this Court's findings of fact and conclusions of law as required by FED. R. BANKR. P. 7052.

For the reasons set forth below, this Court denies the Motion to Dismiss, without prejudice.

### FACTS

This Chapter 7 case was filed on June 26, 2005. That same day, the Debtor filed a notice of removal of a state court action (the "State Court Action") to the bankruptcy court. The State Court Action, which had been initiated by The Lamson & Sessions Co. ("Lamson") in July 2004 against YSD and William Mundinger and William Peters, set forth five causes of action: fraudulent transfer, breach of contract, alter ego, breach of fiduciary duty and unjust enrichment. Mundinger and Peters were directors of YSD and were YSD's sole shareholders.

By way of background, the Debtor was formerly known as The Youngstown Steel Door Company and manufactured railroad car doors and related railroad components. In or about 1976, Lamson purchased the steel door business and operated it as a wholly owned subsidiary until 1988. On or about March 9, 1988, Lamson sold and YSD purchased substantially all of the assets of the steel door business. Pursuant to the purchase agreement, YSD assumed certain benefit plans, including health and life insurance plans for certain employees and retirees of the steel door business. Certain retirees brought a class action lawsuit relating to the assumed benefits, which was resolved in August 1988 by a settlement agreement, pursuant to which the Debtor is liable for certain employee benefit obligations (the "Retiree Health Plan Obligations") of the business and Lamson provided a limited guarantee of these obligations, until 2010, in the event of the Debtor's default. To the extent that Lamson made or makes payments to satisfy the Retiree Health Plan Obligations, the Debtor is obligated to reimburse Lamson for those payments.

Lamson alleges, and the Debtor appears to concede, that in 2001, while YSD was insolvent or on the brink of insolvency, the company transferred cash and assets from YSD to Mundinger and Peters. Lamson alleges that such transfers were made without any consideration. These alleged transfers were, as follows:

(a) On or about July 2002, YSD received from one of its insurers, Anthem, upon its demutualization, in excess of $3 million in Anthem stock. From these amounts, Mundinger and Peters authorized and directed YSD to make distributions to themselves (as shareholders) totaling $3,151,571;

(b) On or about September 2002, Triax–YSD, Inc. ("Triax"), a wholly-owned subsidiary of YSD, was spun-off and became a free standing company with Mundinger and Peters as its directors and officers. The Triaz [sic] spinoff, authorized and directed by Mundinger and Peters, resulted in a distribution by YSD to Mundinger and Peters of $1,241,374;

(c) On March of 2003, Mundinger and Peters, as directors of YSD, authorized YSD to make a distribution to Mundinger and Peters, as shareholders of YSD, in the amount of $167,556.

(Motion to Dismiss at ¶ 7.)

On or about April 3, 2003, YSD notified Lamson that it was unable to make one of

its monthly payments for the Retiree Health Plan Obligations. In response, Lamson loaned money to YSD. In subsequent months, YSD called upon Lamson to make additional loans for the Retiree Health Plan Obligations payments and Lamson did so. These loans were evidenced by a promissory note secured by a mortgage on certain real estate of YSD.

Because YSD continued to struggle financially, YSD's secured lender, LaSalle Bank, N.A. ("LaSalle"), ultimately foreclosed on substantially all of YSD's assets, which served as collateral for LaSalle. (Exhibits A—C, Foreclosure Agreement, Schedule 2.1, and Supplemental Agreement.) As of April 5, 2004, substantially all of YSD's assets were sold to Railco Industries, Inc. pursuant to a foreclosure agreement and other related documents. (Exhibit D, Closing Statement.) The proceeds of this sale were used to satisfy YSD's obligations to LaSalle and to partially pay Lamson on account of the promissory note secured by the mortgage. Around this time, YSD notified Lamson that it would no longer be able to satisfy the Retiree Health Plan Obligations and Lamson thereafter notified the applicable retirees that it would assume such payment obligations. Also around this time, YSD filed papers with the Secretary of State for the state of Ohio changing its name to 3710 Henricks Road Corp.

YSD, through its attorneys, Nadler Nadler & Burdman, began to wind up its affairs and operations, including collecting on accounts receivable that were part of the assets excluded from the sale and paying certain of YSD's creditors. At the hearing, counsel for the Debtor stated that, among the actions taken to wind up the company were payment of approximately Two Hundred Seventy Thousand Dollars ($270,000.00) in priority taxes to the Mahoning County Treasurer,[1] payment of approximately Three Hundred Thousand Dollars ($300,000.00) in severance, vacation and other benefits owed to employees and payment to Anthem Blue Cross after an audit of open and paid claims. As part of the winding up, YSD's counsel informed Lamson's counsel that there would be little cash left to pay unsecured claims. In compliance with YSD's request that Lamson submit a notice of its unsecured claim, Lamson's counsel sent a letter dated May 13, 2004 setting forth the amount of its claim. (Exhibit E, Letter from William H. Coquillette to Edward F. Smith dated May 13, 2004.) When there was no response to the claim letter, in July 2004, Lamson initiated the State Court Action.

The State Court Action alleges that Lamson has been damaged in the approximate amount of Three Million Five Hundred Thousand Dollars ($3,500,000.00) as a result of alleged fraudulent transfers, breach of contract, breach of fiduciary duty, alter ego and unjust enrichment. Lamson filed an Amended Complaint on or about September 28, 2004 that contained the same causes of action. Apparently at the request of the defendants in the State Court Action, the parties participated in two mediation efforts—both of them unsuccessful. The first mediation occurred in February 2005 and the second mediation took place on June 24, 2005. The stay of discovery was supposed to expire on July 1, 2005.

Only two days after the second mediation failed and just days before discovery was to begin in the State Court Action, the Debtor filed the instant Chapter 7 bankruptcy petition. Lamson asserts that the

---

1. It is not clear to the Court whether this amount was paid and is in addition to the priority taxes currently being claimed by the Mahoning County Treasurer or if the amount of the claim and this reference constitute one and the same obligation.

filing was in bad faith and, consequently, the case must be dismissed. In support of its allegation of bad faith, Lamson points to the following facts and makes the following arguments:

(a) Immediately after the mediation concluded, the YSD Board of Directors met at the offices where the mediation was held and resolved to file a Chapter 7 bankruptcy petition (Exhibits F & G, Minutes and handwritten notes of Board Meeting; Mundinger Deposition at 142–43, 150; Peters Deposition at 27);

(b) Despite being unable to pay its debts since 2003 and having sold its assets and having ceased operations in 2004, this Board Meeting was the first time the Directors considered filing for bankruptcy protection (Peters Deposition at 33);

(c) The minutes of the Board Meeting reflect that the company was "without assets" (Exhibit F, Minutes of June 14, 2004 Board of Directors Meeting);

(d) Mundinger and Peters, as shareholders, had an obvious personal interest in retaining the assets transferred to them as allegedly fraudulent transfers;

(e) Mundinger and Peters, as directors, had a fiduciary duty to the company and its creditors, and their status as defendants in the State Court Action presented a conflict of interest with YSD (Mundinger Deposition at 145–46);

(f) James Messenger, who was also a director of YSD and who acted as legal counsel for both the company,[2] and Mundinger and Peters individually, (i) had a fiduciary duty as a director to the company, (ii) had a duty as YSD's counsel to advise the other directors of their fiduciary duties, (iii) had a duty as counsel to Mundinger and Peters to take action so that the shareholders could keep the transferred funds and, (iv) as counsel to YSD, had a duty to attempt to have the transferred funds returned to the company (Mundinger Deposition at 144–46);

(g) Because all of the decision makers—Mundinger, Peters and Messenger—were unavoidably conflicted, the decision to file the bankruptcy petition was made in bad faith and as a litigation strategy.

Lamson also cites to Mundinger's testimony as Debtor's representative at the Rule 2004 examination that YSD thought the State Court Action was for the purpose of Lamson recovering One Hundred Thousand Dollars ($100,000.00) that remained unpaid under a 1995 agreement. According to Mundinger, he didn't discover the true nature of the State Court Action until the second mediation attempt. He testified that, after realizing the nature of the State Court Action, it didn't make sense to settle with only one creditor. Lamson argues that this testimony isn't credible.

### ANALYSIS

■ Lamson alleges that the reasons for the bankruptcy filing proffered by the

2. Lamson points out that it is unclear if Messenger was a director at the time of the June 26, 2005 Board Meeting. Mundinger testified at deposition that Messenger was a director at that time, but the record contains a letter of resignation from Messenger dated June 27, 2005, with the resignation effective December 1, 2004. There is no explanation in the resignation letter for the timing and Mundinger could not explain the timing at his deposition. (Exhibit I, Letter from James L. Messenger dated June 27, 2005 and Mundinger Deposition at 144.) Peters testified that Messenger was acting only on behalf of the shareholders, *i.e.*, Mundinger and Peters, at the June 26 Board Meeting (Peters Deposition at 28), but Mundinger testified that Messenger was acting as counsel for both the company and the shareholders at that time (Mundinger Deposition at 118, 130–31). Lamson asserts that Messenger apparently resolved the conflict by acting only in the interests of the shareholders in having the company resolve to file the bankruptcy petition.

Debtor and the Trustee in opposition to the Motion to Dismiss aren't credible and don't square with the facts. Lamson correctly points out that neither counsel for the Debtor nor the Trustee attended the June 24 Board of Directors' meeting. Lamson asserts that the reason for filing proffered by Debtor's counsel and the Trustee—i.e., to deal with all creditors in one forum—isn't supported by the facts. Lamson points out that the concern for the creditors isn't even mentioned in the Board minutes; the only reason given in the minutes relating to the bankruptcy is that the company has no assets.

Lamson's case is largely circumstantial. Lamson urges that, if this Court should find that it has not met its burden of proof with respect to the Motion to Dismiss, it should be allowed to set forth statements that were made during the mediation that would, according to Lamson, conclusively demonstrate the lack of good faith in this bankruptcy filing. At present, Lamson is restrained from disclosing such statements by the confidentiality requirements imposed by Ohio Revised Code § 2317.023. Lamson urged this Court to relieve it of such obligation of confidentiality. Prior to the hearing on the Motion to Dismiss, the Court denied Lamson's motion for a hearing pursuant to O.R.C. § 2317.023.[3] This Court finds that even if, arguendo, the reasons Mundinger and Peters authorized the filing of the bankruptcy petition did not evidence good faith, dismissal of the case would not be in the best interests of the creditors or the estate. Accordingly, there is no need to abrogate the confidentiality of the mediation discussions to attempt to establish the alleged bad faith.

Lamson relies heavily on Industrial Insurance Services, Inc. v. Zick (In re Zick), 931 F.2d 1124 (6th Cir.1991), which held that lack of good faith is a valid basis to dismiss a Chapter 7 case "for cause." "We are persuaded that there is good authority for the principle that lack of good faith is a valid basis of decision in a 'for cause' dismissal by a bankruptcy court." Id. at 1127. The dismissal motion in the Zick case was brought by the principal creditor pursuant to § 707(a) of the Bankruptcy Code, 11 U.S.C. § 707(a). The Sixth Circuit held that the word "including" in § 707(a) was not meant to be a limiting word and recognized that a lack of good faith was the basis for the dismissal of a number of bankruptcy cases under § 707(a). The Court found that there was merit to the "smell test" in Morgan Fiduciary, Ltd. v. Citizens and Southern International Bank, 95 B.R. 232, 234 (S.D.Fla. 1988). Zick at 1127–28. The Court went on to say: "The factors relied on by the bankruptcy court are essential in appellate review, and should be set out in the bankruptcy court's decision." Id. at 1128.

The basis for the bankruptcy court's holding was set forth as follows: [T]his case is dismissed for the following reasons. Congress intended to give an honest debtor filing in good faith a fresh start. And in this case, it is conceded that the Debtor's manipulations have reduced this to a one creditor case. It appears to be for the sole purpose of avoiding payment to your client, Industrial. It also appears that the Debtor has made no marginal, much less significant adjustments to his lifestyle, to make any fleeting or meaningful effort to repay the obligation. The case was

---

**3.** There are public policy reasons that statements made during mediation and during settlement discussions should remain confidential. Making such statements public or part of the record could have a chilling effect on future settlement discussions. In the present case, the Court cannot find that there is sufficient justification to permit Lamson to be relieved of its obligation of non-disclosure.

filed nine days after the Debtor entered into a Consent Judgment in the Oakland County Circuit Court. That is uncontested on this record. It is uncontested on this record and, indeed, it is admitted that the entry of that Judgment precipitated the filing. It is uncon-tested on this record and, indeed, it is admitted that this has been structured as a one creditor case. Everyone who is a Bankruptcy Judge dis-agrees about this because there is no cook book analysis that you can give. **It really comes down to a sense of what is fair and just. And in this case, it is unfair and unjust for this Debtor to have filed this case in bad faith.**

*Id.* at 1126, n. 1 (emphasis added).

The *Zick* case involved an individual Chapter 7 debtor, rather than a corporate entity, that had filed a Chapter 7 petition to deal with a single creditor with a large judgment against the debtor. Although § 707(a) applies equally to individuals and corporate Chapter 7 cases, the facts and circumstances of the Zick case are substantively different from the instant facts. This is not a single creditor case. Lamson holds a substantial claim against the Debtor; however, it is not YSD's only creditor and, indeed, not the only creditor with a large claim against the Debtor. In *Zick*, the debtor entered into a Consent Decree and nine days thereafter filed for bankruptcy protection to avoid paying its sole creditor. Lamson argues that the *Zick* facts are facially similar to the instant case, which was filed immediately after the second mediation failed to result in settlement. The big difference, however, is that in *Zick*, the Chapter 7 case was filed to stop a single creditor from being able to collect on its judgment whereas here the Chapter 7 case merely resulted in the lawsuit being litigated in another forum. Lamson asserts that the Debtor's bankruptcy filing is merely a litigation strategy

to avoid litigation with Lamson. Lamson may be correct, but that doesn't necessitate dismissal of the case. Lamson took the initiative to pursue the Debtor, as well as Mundinger and Peters, in the State Court Action in an attempt to recover on its alleged causes of action. Even Lamson acknowledges that, if it were to be successful in the State Court Action, it would establish that all creditors were hurt by the actions of the defendants. As a consequence, the fact that Mundinger and Peters may have been motivated to file the Chapter 7 case as a litigation tactic, does not mandate that the case should be dismissed.

Lamson also cites to *In re American Telecom Corp.*, 304 B.R. 867 (Bankr. N.D.Ill.2004), for the proposition that a Chapter 7 case was never intended to serve merely as a litigation tool. In *American Telecom,* Siemens obtained a pre-petition judgment for $173,000 against the debtor. By the time that Siemens could collect (after appeals and conducting a citation-to-assets proceeding), the debtor had ceased operations and had virtually no assets. Siemens initiated a collections action against the debtor and two shareholders/principals in an effort to pierce the corporate veil. Subsequently, the debtor filed a Chapter 7 petition, listing Siemens as its only creditor. Later the debtor asserted that its lawyers had a contingent claim for fees and that the two insiders had claims for unpaid rent and salary (which claims were scheduled as having priority over Siemens' claim). The collection action was on appeal when the debtor filed its Chapter 7 case. The Bankruptcy Court determined that there were two scenarios that could be played out on appeal, each of which would result in there being no role for a Chapter 7 trustee to distribute assets to creditors. In dismissing the case, the Court stated: "A major consider-

ation that has led other courts to conclude that a Chapter 7 case should be dismissed is the fact that the case is primarily a tool for thwarting the collection efforts of a single creditor holding a disputed money judgment." *Id.* at 873 (*citing In re Zick,* 931 F.2d 1124, 1128 (6th Cir.1991)); *In re Huckfeldt,* 39 F.3d 829 832–33 (8th Cir. 1994); *In re Collins,* 250 B.R. 645, 654–55 (Bankr.N.D.Ill.2000); *In re Stump,* 280 B.R. 208, 214 nn. 1 & 2 (Bankr.S.D.Ohio 2002). As set forth above, the instant case can not be viewed as a tool for thwarting the collection action of a single creditor.

In the present case, it appears that Peters and Mundinger may have decided to file the Debtor's Chapter 7 petition as a litigation tactic, but Lamson is not the Debtor's sole creditor and most, if not all, of the causes of action that Lamson has asserted in the State Court Action can be maintained for the benefit of all of the Debtor's creditors.

It appears that Mundinger and Peters may well have been motivated by self interest in causing the Debtor to file the bankruptcy petition. It certainly appears credible that, having failed to reach an acceptable agreement to settle the State Court Action with Lamson, they decided the company should seek bankruptcy protection. This decision enabled Mundinger and Peters to get the State Court Action before this Court. It may well be that Mundinger and Peters believed that a more favorable settlement could be reached with a bankruptcy trustee than with Lamson in light of the limited resources (*vis-a-vis* Lamson) that the Trustee will have to pursue litigation. The Trustee has assured the Court that, if the motion to substitute the Trustee as the plaintiff is granted,[4] he will vigorously pursue these claims on behalf of the estate and the creditors.

All in all, Lamson presented a good circumstantial case that the bankruptcy filing was made in bad faith. That being said, however, is it "fair and just" for this case to remain in this Court? In other words, even if this case was filed for the wrong reasons (*i.e.,* the actions of Mundinger and Peters "smell"), should this case be dismissed?

If, as Lamson alleges, the transfers to Mundinger and Peters were fraudulent, such actions hurt all of the creditors, not just Lamson. Lamson even acknowledges this fact in its pleadings in the State Court Action. Lamson initially asserted that it was the largest creditor of YSD by a wide margin and that Lamson should be permitted to pursue the State Court Action. Since the filing of this bankruptcy petition, other creditors have come to the foreground. In particular, the USW alleges that, as the representative of the more than 300 retirees, the USW may be the largest creditor of the estate by virtue of the unpaid Retiree Health Plan Obligations. The Mahoning County Treasurer has also filed a claim and made an appearance in this case for unpaid priority taxes. Although it has not yet filed a claim, the Debtor asserts that the Ohio Bureau of Workers Compensation will also likely be a large creditor of the estate. The Debtor asserts that there are nearly 150 other unpaid trade creditors of the estate, but based on the Debtor's own schedules, it appears that Lamson has substantially the largest claim among those trade creditors. As a consequence, although Lamson initially appeared to be the estate's largest creditor (but never the sole creditor), it now must share the distinction of "large creditor" with other entities.

Lamson acknowledges that other creditors have rights to pursue their damages

4. That motion is not presently before this Court.

under the fraudulent transfer claims and suggests that they could join Lamson in the State Court Action if the bankruptcy case were to be dismissed. Although this proposal may be possible, it does not sound like a practical or the most desirable solution.

■ The Court has several concerns regarding dismissal. First, if the case were to be dismissed, Lamson urges that the dismissal should be with prejudice. Although it might make sense to preclude the Debtor from filing a second voluntary petition if the initial filing was in bad faith, it certainly would be inequitable and unjust to prohibit an involuntary petition against the Debtor by YSD's creditors if this case were to be dismissed. Now that the USW and the Mahoning County Treasurer have been apprised of the potential for recovery if the fraudulent transfer claims are pursued, they (along with one other creditor) could file an involuntary petition putting YSD back into Chapter 7.[5] The alleged lack of good faith in filing this petition should not, and this Court finds would not, preclude an involuntary filing. That being said, there appears to be no purpose served in dismissing the Chapter 7 case at present.

The Trustee's motion to substitute himself as plaintiff in the adversary proceeding is not presently before the Court. When that motion is addressed, however, the Court has concerns about whether the Trustee will have the resolve and the resources to vigorously pursue the fraudulent transfer claims.[6] The Debtor (who for apparently self serving reasons wants this case to remain in this Court) made various representations that appear to be at odds with each other. On one hand, the Debtor alleged that there could be 700–900 creditors in this case—if asbestos claims are included. In the next breath, the Debtor stated that the asbestos claims are being handled and paid by the State of Ohio Bureau of Workers Compensation and, thus, individual asbestos claims could not appropriately be brought against the estate. The estimate of 700–900 claims also appears to include individual employee claims even though the USW asserts that it represents all of the unionized retirees and the Debtor represented that the salaried employees should not have any further claims. If, indeed, there are more than 250 claims, the Trustee will need funds to engage a claims administrator. The limited cash that the Trustee has on hand will make such an engagement difficult. Even if there are fewer than 250 claims, thus abrogating the need for a claims administrator, if the Court were to grant the Trustee's motion, the cost of litigating the fraudulent transfer and other claims could be cost prohibitive.

The Court will carefully monitor this case. If it appears to be floundering, dismissal to provide Lamson the opportunity to pursue the State Court Action may well be appropriate at that later date.

5. Based upon the aggressive opposition of the USW and the Mahoning County Treasurer to the Motion to Dismiss, this Court believes it is most likely that an involuntary petition would be filed.

6. The decision to file the Chapter 7 petition was apparently made by Mundinger and Peters in order to protect their own interests. Despite this appearance, the Debtor itself is strongly advocating that the case not be dismissed. Indeed, the Debtor—not the Trustee—took the lead in opposing the Motion to Dismiss. Additionally, in a related pleading, the Trustee filed a response that was identical to that filed by the Debtor. In a situation like the present one, where there appears to be bad faith on the part of the principals/shareholders/directors in filing the case, the Court has some concern that the Trustee and the Debtor may be too closely aligned.

## CONCLUSION

Lamson has put on evidence, although largely circumstantial, that indicates that Mundinger and Peters may have acted in their self interests rather than the interests of the Debtor and its creditors in filing the bankruptcy petition. Despite this showing, however, it does not appear to be in the best interests of the creditors to dismiss this case. As set forth above, it would be inequitable to prohibit the creditors from filing an involuntary case against YSD just because Mundinger and Peters may have acted in their self interest in filing the Chapter 7 case. If an involuntary case may be filed (and given the circumstances, that seems likely to the Court), then no good purpose would be served by dismissal now. The fraudulent transfer cause of action is clearly one that, if proved, harmed all of the creditors—not just Lamson. Accordingly, it is fair and just for this case to remain pending. The Motion to Dismiss is hereby denied, without prejudice to being renewed under appropriate circumstances.

An appropriate order will enter.

### ORDER DENYING MOTION TO DISMISS

For the reasons set forth in this Court's Memorandum Opinion entered this date, the Corrected Motion of Creditor The Lamson & Sessions Co. for an Order, Pursuant to Section 707(a) of the Bankruptcy Code, Dismissing the Bankruptcy Case of the Debtor With Prejudice is hereby denied, without prejudice.

**IT IS SO ORDERED.**